RECEIVED

MAY 08 2026

Clerk, U.S. Courts
District of Montana
Missoula Division

08 May, 2026

Federal District Court of Montana

**PLAINTIFF**: John K. Mues (512 Larkspur Rd., Deer Lodge, MT 59722), representing himself *pro se*

**DEFENDANTS**: Honorable Kenneth Schubert, Honorable Paul Eagle, Honorable Frances Turean, Honorable Camille Schaefer, and Honorable Nicholas Straley (of King County Superior Court; 516 3rd Ave; Room W382; Seattle, WA 98104); Kirstyn Palmisano (of Elliott Palmisano Law Group; 3815 S. Othello St.; STE 100-315; Seattle, WA 98118); Serin Ngai (of Sound Family Solutions PLLC; 600 1st Ave; Seattle, WA 98104); Selena Shelley (11415 NE 128th St; STE #100; Kirkland, WA 98034); Patricia English (3921 42nd Ave SW; Seattle, WA 98116); M Craig Bray and Doug Ende (of Washington State Bar Association; Office of Disciplinary Counsel; 1325 Fourth Ave; STE 600; Seattle, WA 98101-2539); Dr. Umair Shah and Dennis Worsham (of Washington State Department of Health; Town Center 2; 111 Israel Rd. S.E.; Tumwater, WA 98501); Mayra Toledo and Sarah Mitchell (of Highline School District; 15675 Ambaum Blvd SW; Burien, WA 98166); Claudia Carboni (22206 10th Ave S; Des Moines, WA 98198); State of Washington (1125 Washington St SE; Olympia, WA 98504-0100); Highline School District (15675 Ambaum Blvd SW; Burien, WA 98166); and Joe Doe et al.

**COMPLAINT**: A highly profitable cottage industry in the family law space in Washington State exists that traffics in false, perjurious allegations against fathers. This skews child custody and division of assets deliberations and orders. It is encouraged and defended by the State of

Washington, particularly its state courts, Department of Health, and the Washington State Bar Association (whose Office of Disciplinary Counsel has been empowered by the Washington State Supreme Court to oversee the ethical standards of the state's attorneys). Said cottage industry and the government entities supporting it constitute an Enterprise by which its members perform criminal and unconstitutional predicate acts, harming fathers and their children. Such predicate acts include deprivation of Due Process (14th Amendment), violations of 2nd Amendment of the U.S. Constitution, deprivation of rights under color of law (18 U.S.C. § 242), perjury (RCW 9A.72.020), and assault (RCW 9A.36.011). Commercial effects from these predicate acts routinely cross state borders and harm Washingtonians and non-Washingtonians alike. Given the existence of an Enterprise, which functions as an engineering system, members of such an Enterprise who commit predicate acts, and cross-border commercial effects, the plaintiff is also making a RICO complaint (18 U.S.C. § 1962) - the aforementioned violations are the predicate acts of RICO - without which his damages, even if addressed, would simply be experienced, again, by thousands of other fathers and their children in the near future in Washington State.

**ADDITIONAL COMPLAINTS:** Violations of Individuals with Disabilities Education Act (IDEA); Violations of Computer Fraud and Abuse Act (CFAA); Violations of Sanctuary Jurisdiction (8 U.S.C. § 1373); Judicial Misconduct (Article IV, Section 31 of the Washington State Constitution); Violation of 1st Amendment of the U.S. Constitution.

**ASSOCIATED CASE LAW:** Troxel vs. Granville; Santosky vs. Kramer; United States vs. Turkette; United States vs. Robertson; United States vs. Bledsoe; United States vs. Mandel; etc.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**JURISDICTION:**

This complaint is submitted to the Federal District Court of Montana, versus the Western Washington Federal District Court, due to the plaintiff's longstanding and current residency in Montana. In addition, each of the defendants, without exception, reside in Washington State, related to diversity jurisdiction. Western Washington Federal District Court has expressly discouraged - on its website and on the front covers of complaint forms - the submission of complaints related to Washington State's family law industry. Such warnings are, unfortunately, not dissimilar to how courts in the Deep South once discouraged complaints regarding racism in the Jim Crow era. That is, fathers - including those who are not Washingtonians - face epidemic levels of civil rights violations in divorce court in Washington State, and the warnings against family law-related complaint submissions is presumably a function, at least partially, of the volume of such complaints Western Washington Federal District Court receives. Rather than acknowledge the possibility of a severe civil rights situation in Washington State - indeed, a federal question - the respective federal court has abdicated its solemn responsibility and perhaps forgotten that the 14th Amendment of the U.S. Constitution protects a parent's right to be a parent, only to be curtailed if the state assesses that the best needs of the child (or children) require it. The assumption, as evidenced by centuries of case law, should not be that the state always operates in good faith, and needs no federal corrective.

Washington State, in particular, was accused, as recently as August, 2025, by the U.S. Department of Justice, of possible "federal obstruction, conspiracy, and harboring statutes that

carry criminal penalties with prison time." Washington State's recognition of the importance of federal law and the U.S. Constitution is circumspect, at best. In the context of this complaint, if the state has not accounted for the best needs of the child - for instance, because of its welcoming and embracing proved false, perjurious allegations against the father; refusing to judicially notice evidence, including depositions, proving such perjury; retributively punishing the father for having pursued depositions which prove perjury and suggest medical malpractice by Washington State neurosurgeons against his son; retributively punishing the father for seeking, in light of Washington State indifference to criminal perjury, federal assistance; refusing, given the plaintiff's disabled child's high levels of medical complexity, to judicially notice medical doctors' concerns about the mother's parental fitness and their unhedged endorsement of the father's parental fitness, including confirming that he had recently saved the life of his critically ill son while in the Intensive Care Unit and intervened when the mother was pushing for a surgery on the child that he did not need and could have damaged him; threatening the father's life with rulings and decisions that could clearly damage him physically; ignoring the mother's professionally diagnosed psychiatric disorder and documented history of suicidal ideating and other intrusive thoughts, including while six months pregnant, contributing to the premature birth of the child, and postpartum child neglect, thwarted by the plaintiff; ignoring evidence of the father's decision to be a stay-at-home father and husband for several years to his wife and child who were both experiencing life-threatening medical conditions - then the 14th Amendment's parental protections supersede the state's biases and rulings against the father.

Washington State cannot nowadays say it has a "compelling state interest" in a family law case that supersedes the 14th Amendment's protection of a Montana father's right to raise his

Page 4 of 46

child - at least to have some appreciable parenting time, versus 0%, particularly when the father has never laid a hand in anger on anyone or threatened to do so, as universally agreed on, and has, repeatedly, saved his son's life, as attested to by medical doctors - when its compelling state interest is, in fact, once pretense is stripped away, to marginalize, if not destroy - whenever it is able to - fatherhood itself. While that may have once been a hyperbolic claim, consider that Washington State - especially in King County, or Greater Seattle - has embraced, at various times, widespread decriminalization, gender conversion therapy of minors and their right to hide such therapy from their parents, and abolishment of the police (a police precinct in the Capitol Hill district of Seattle had to be abandoned to make way for the elected official-endorsed Capitol Hill Autonomous Zone (C.H.A.Z.), which resulted in a string of preventable murders). Credible statistical studies, as well, rank Washington State's courts among the most anti-father in the nation, based on a dearth of parenting time for fathers and other inequities.

The point is not to conflate Washington State's controversial policies with King County Superior Court's rulings - to date - to excommunicate the plaintiff from his disabled son's life - turning his son's upbringing entirely over to a foreign national with a diagnosed psychiatric disorder whose suicidal ideations - as a transcript of an admitted audio recording substantiates - prompted the child's premature birth and whose postnatal neglect of the child was constantly thwarted by the plaintiff - but to emphasize the state's requirement, when the level of its curtailment of fatherhood appears grossly disproportionate and asynchronous to the evidence, to prove its good faith in invoking a "compelling state interest" which shall supersede the 14th Amendment's protection of a father's right to have parenting time with his child. The state's reply cannot simply be, "Trust us," or "We had a trial with a result," particularly given the

Page 5 of 46

following discrepancies: 1) perjury against the plaintiff was rampant, tolerated, and taken at face value; 2) the plaintiff was forced, while severely ill, representing himself pro se, to participate in the four-day trial, which contributed to his near death; 3) the Office of Disciplinary Counsel refused to review evidence of the opposing counsel's perjury; 4) the Department of Health allows mental health practitioners to disparage individuals they've never met on behalf of paying clients; 5) opposing counsel was allowed to hand-pick the Guardian ad Litem, with whom she has worked several times, especially given the preponderance of false allegations against the father; 6) King County Superior Court financially obligated the plaintiff well beyond his gross annual income, forcing him into homelessness and depriving him the opportunity to afford legal counsel for the trial; 7) and King County Superior Court, across multiple hearings, including the trial, refused to admit the depositions proving perjury and other critical evidence.

Furthermore, the plaintiff, when he has commuted from his home in Deer Lodge, Montana to Seattle, in order to see his son per a court-established visitation schedule - from Temporary Orders issued in August, 2024 through June, 2025 - almost ten months of never missing a single visitation - has been falsely accused of child neglect by his ex-wife - based on no evidence of child distress or harm, but rather staged photos of an old dirty diaper (and refried beans in the front bangs of the child's hair) coinciding with when the plaintiff returns the child - reflexively believed and acted upon by King County Superior Court, relegating the father to negligible parenting time and supervised visits only.

The potential that, while traveling to Washington State, additional false accusations - including of an even more serious nature - could result in the plaintiff's imprisonment and loss of

liberty is real and non-trivial. Conversely, travel, if required, to Montana from Washington State would pose no such danger to the defendants' liberty. Moreover, rulings by King County Superior Court, to date, have literally threatened the plaintiff's life. The court ordered the plaintiff to pay a combination of alimony, child support, attorney fees, and Guardian ad Litem fees which well exceeded his gross annual income (and the average of the plaintiff's gross annual income over the last five years), causing him to be housing insecure and sleep, for the majority of nights over the last two years, in his truck. In turn, the plaintiff contracted pneumonia. The plaintiff is an honorably discharged, decorated military veteran and respected public school teacher from Montana, who, again, has never laid a hand in anger against anyone nor ever threatened to do so, as supported by evidence and challenged by no counter-evidence. Nonetheless, King County Superior Court forced the plaintiff to participate and represent himself pro se in a four-day divorce trial (virtual attendance) while he was severely ill, based on medical records submitted to and acknowledged by the court and over the plaintiff's repeated objections, each overruled. Periodically, during the trial, the plaintiff would have to lie down and fall asleep. After the third day of trial, the plaintiff went to the Emergency Room (ER) of the VA hospital in Helena, Montana. Chest X-rays and other data confirmed not only influenza (about which the court had known since the end of Day 1 of the trial) but pneumonia. Upon departing the VA hospital, the plaintiff experienced a serious auto accident, in which both vehicles were totaled, on Highway 12, between Helena and Deer Lodge, which nearly cost him his life. The plaintiff had lost consciousness at the wheel. Aged 52, he had never been in an auto accident before. While no citations were issued, the plaintiff's influenza, pneumonia, and having been forced by King County Superior Court to participate, while representing himself pro se, in a trial over several

days while seriously ill surely contributed to the near-fatal accident. Being forced to participate while severely ill may have also caused permanent damage to the plaintiff's respiratory system or vocal chords. Had the plaintiff been killed - the Montana Highway Patrol had said that it had been a miracle he and the driver of the oncoming vehicle hadn't been - no one would have known that King County Superior Court had forced the plaintiff, while he was representing himself pro se, while severely ill, over his many objections, to participate in a multi-day trial.

Other entities and quasi-entities of Washington State government have also contributed to the plaintiff's dire status. The root cause of Washington State's relentless maltreatment, if not assault, of the plaintiff may be the plaintiff's argument, based on statistical studies, anecdotes, and dozens of unambiguous first-hand examples, that a highly profitable private sector cottage industry of false allegations, including criminally perjurious ones, against fathers prominently exists in Washington State, which the state itself, from its courts (which adjudicate family law cases) to the Washington State Department of Health (which licenses and regulates mental health professionals, who provide declarations to the court) to the Office of Disciplinary Counsel (empowered by the Washington State Supreme Court to regulate the state's lawyers), recognizes, welcomes, and protects. In addressing this criminal cottage industry, in the plaintiff's court-submitted declarations, remarks during hearings, in having written and published a book on the matter, and communications with the Washington State AG, Montana State AG, and U.S. Department of Justice, among other federal entities, Washington State government and the criminal cottage industry it defends have sought to destroy the plaintiff.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATEMENT OF FACTS:

*""As a society we've made progress regarding gender in a number of areas. But the dark corner of the room when it comes to civil rights, I can tell you, is dads' rights in family courts." The most common issues, Cordell says, are that men rarely get equal access to their children and are often victims of false abuse allegations. He estimates that 85% of temporary restraining order requests during divorces are mere "tactics"." - The Guardian (2016)*

*"The interest of parents in the care, custody and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." - Honorable Sandra Day O'Connor, U.S. Supreme Court Justice, Troxel vs. Granville, 530 U.S. 57 (2000)*

*"False allegations, often filed without prior documentation of abuse or mediation attempts, are increasingly used in divorce and custody proceedings." - "The Silver Bullet Method: The Rise of False Allegations in Divorce and Custody Cases" in Attorney at Law Magazine, by Padideh Jafari, Esq. founder and CEO of Jafari Law & Mediation Office, and former NYU and Southern California Institute of Law professor (2025)*

*"[Washington State is accused of] federal obstruction, conspiracy, and harboring statutes that carry criminal penalties with prison time." - U.S. Department of Justice (2025)*

While running for U.S. Senate in Montana, the plaintiff's wife's water broke while six months pregnant in a recently-purchased second home in Greater Seattle. A year later, she would tell the plaintiff, as corroborated by the transcript of an audio recording, that, prior to her water breaking, she had attempted suicide by hanging in the garage of that recently-purchased second

home.  Subsequently, she would be diagnosed by a licensed psychotherapist with severe PTSD, connected to a fatal SCUBA diving accident in Canyon Ferry Lake, Montana she had observed.

Two weeks after the wife's water broke, their son was born prematurely at 28 weeks in Swedish Hospital.  After five months in the Neo-natal Intensive Care Unit (NICU) at Swedish Hospital, during which their son contracted E.coli Meningitis, nearly expired, required a VP brain shunt to be installed, and had a feeding tube installed, he was discharged.  He was brought to the plaintiff's and his wife's second home in Greater Seattle, with multiple neurosurgery, neurology, gastrointestinal, and therapy appointments scheduled across Swedish Hospital and Seattle Children's Hospital.

Once out of the NICU, their son began to manifest VP brain shunt failure symptoms with increasing frequency and severity.  Each time, the plaintiff would - following neurosurgeons' advice - take the child to the Emergency Room (ER) for a diagnostic "shunt series".  Whether by own vehicle or ambulance, their son was brought to the ER exhibiting VP brain shunt failure symptoms several dozens of times.  Each time, the neurosurgeons would deem the VP brain shunt working well.  The recurring VP brain shunt failure symptoms became a serious mystery illness.

To make matters worse, the mother resisted taking the child to the ER when he manifested VP brain shunt failure symptoms, including seizures.  This risked potential brain over-pressurization that could result in brain damage, hydrocephalus, and even death.  The plaintiff would often have to intervene, at the risk of his wife's ire, ensuring the child reached the ER.  (A transcript of an audio recording, admitted by the court, after their son had had a seizure, by which he lost consciousness, shows the plaintiff's wife bullying the plaintiff for believing that

Page 10 of 46

the seizure was "serious", telling him, among other things, in front of their son, that his concerns were just in his "fucking mind". In retrospect, the plaintiff had been correct. The child had, at that moment, needed - based on the size of his ventricles - emergent VP brain shunt replacement and relocation neurosurgery. Instead, he did not get the proper care and experienced two more material seizures in the following three weeks, and likely brain damage.)

Their son's VP brain shunt failure symptoms culminated in the Intensive Care Unit (ICU) of Seattle Children's Hospital in August, 2023. He was categorized "critically ill" - the first time he had been so categorized since the NICU. As always, the neurosurgeons deemed that the VP brain shunt was working well. The plaintiff - as confirmed by the deposition of an ICU doctor - told the ICU doctors that the neurosurgeons might be wrong and that a direct check of the child's brain pressure needed to be conducted. The plaintiff specifically recommended checking the child's brain pressure via lumbar puncture, given the lack of participation of the neurosurgeons. When the ICU doctors complied, cerebral spinal fluid shot out of the child's spine like a geyser, and the doctors measured 600% higher than normal brain pressure (60 versus 10 centimeters of water pressure). ICU doctors ordered the neurosurgeons to immediately revise the VP brain shunt. When neurosurgeons replaced the VP brain shunt's valve, the child went from "critically ill" to normal. After a follow-on surgery a month and a half later, during which the VP brain shunt was completely replaced and relocated, the child no longer exhibited VP brain shunt failure symptoms. Specifically, the child no longer experienced recurring seizures, projectile vomiting, insomnia, lethargy, and extreme pain.

The child, due to the neurosurgeons' false negative regarding his failed VP brain shunt over several years, is projected to be low functional for life. The child, before the extended false

negative, was verbal and had sound receptive language skills. After, he became nonverbal and struggled to decipher the meaning of language.

The plaintiff intended to bring his family back to Montana after the successful two breakthrough neurosurgeries. But, in 2024, his wife, an Italian national, filed for divorce. In addition, she, her psychotherapist, who had never met the plaintiff, and her close friend, who had spent de minimis time around the plaintiff (and always during a planned dinner, usually out in town, with others, who think highly of the plaintiff, attending), submitted declarations to the court falsely accusing the plaintiff of being homicidal, suicidal, stalking, threatening his family with a rifle, being a military veteran exhibiting "manic" behavior, being disengaged from his child's care, not understanding his child's medical needs, and so on. Everything but sexual abuse. The court issued a Restraining Order and Surrender Weapons Order against the father, causing him to be housing insecure. The court also obligated the father to pay a sum of child support, alimony, opposing lawyer fees, and Guardian ad Litem fees that exceeded his gross annual income (and the average of his gross annual income over the last five years). Moreover, the mother had earned more than the plaintiff since 2020. The court successively reduced his parenting time with his son from 16% to 7% to, presently, 0%. Furthermore, the court completely eliminated the plaintiff's participation in the educational and medical decisions regarding his son.

Frankly, had the court's prohibition against the plaintiff to participate in medical decisions concerning his son been in place when his son had been critically ill in the ICU at Seattle Children's Hospital, with neurosurgeons from Washington State, yet again, misdiagnosing his son's life-threatening illness, requiring the plaintiff to intervene and convince the ICU doctors

of the neurosurgeons' negligence - or during the nearly fifty ER runs over the past several years preceding that ICU event - his son would have expired.  A deposition of the main ICU doctor confirmed both the neurosurgeons' negligence and the plaintiff's advocacy for the atypical medical procedure - opposed by the neurosurgeons - that ultimately uncovered their negligence and saved the plaintiff's son's life.  Moreover, post-separation, the court's prohibition against the father's participation in his son's medical life has contributed to, based on medical records, at least one needless seizure and many months of avoidable pre-ictal suffering.

The court penalized the father not only for disclosing extensive perjury against himself, as a father, but for responsibly opposing Washington State's neurosurgeons' negligence.

During a recorded UCCJEA Determination hearing in November, 2024 - the plaintiff had wanted the child custody jurisdiction shifted from Washington State to Montana - he noted, to Judge Schubert - at the time, the trial judge - that false allegations had been made against him. Though Discovery had not yet commenced, Judge Schubert replied that was untrue.  For the plaintiff, in King County Superior Court, in which false allegations against fathers are welcome, there was no due process.

The plaintiff, pro se, with limited financial resources, obtained subpoenas for six depositions. He deposed three medical doctors, each of his wife's two declarants, who had falsely accused him, and the husband of one of the declarants.  The depositions proved pervasive false allegations against him.

King County Superior Court refused to judicially notice the depositions proving false allegations.

The plaintiff's motion for new temporary orders, based on "substantial changes", as the depositions' transcripts illustrated, was unsuccessful. The day of the hearing, Commissioner Frances Turean canceled the hearing because of an excessive word count in the Working Papers Submission List - even though the plaintiff had provided two-page summaries of every deposition. Given that the plaintiff was sleeping out of his truck, lived and was working in Montana, had evidence of sweeping false allegations against him, could no longer afford the financial obligations, and had evidence of the mother's parental unfitness, the decision to enforce a rather discretionary local rule - page count - could be interpreted as the court's desire to allow the perjury against the father and the orders which were based on that to go unchallenged.

The Office of Disciplinary Counsel formally closed out the plaintiff's complaint against the opposing counsel, for packaging and augmenting the false allegations against him, *the very next day* after it had learned, by email, that the plaintiff possessed transcribed depositions, which it refused to review, proving the false allegations.

Washington State Department of Health, which licensed the psychotherapist who had made false allegations against the plaintiff, saw no problem, in response to the plaintiff's complaint, that the psychotherapist had evaluated him - well beyond hearsay - despite never having met him.

During the divorce trial - as throughout the last two years - the opposing party perjured themselves repeatedly. Apparently, Judge Straley - who had replaced Judge Schubert - embraces the construct of "Believe Women", and thus could not recognize the perjury, as each instance came from a woman.

Judge Straley - though he knew that the plaintiff, representing himself pro se, was severely ill - the plaintiff had provided him medical records showing that he had influenza - forced the plaintiff, over his formal objections, to participate in the four-day trial, depriving him of due process. After the third day of trial, his health deteriorating further, the plaintiff returned to the Emergency Room, where he was also diagnosed with pneumonia. During the trial, the plaintiff had both influenza and pneumonia. After departing the hospital, his health devastated from having been forced to participate while severely ill through the trial, the plaintiff fell unconscious while driving back to his home along Highway 12, colliding with an oncoming vehicle. The other vehicle flipped over and the plaintiff's vehicle rammed into the base of a cliff. Both vehicles were totaled, but both drivers, who had no passengers, survived without serious injury.

The plaintiff's pneumonia was caused, in part, by the court's onerous financial obligations and refusal to update temporary orders after transcribed depositions indicating false allegations had become available, which left him financially drained and housing insecure, sleeping out of his truck most nights since the separation two years before. That Judge Straley then forced the plaintiff to participate, while representing himself pro se and severely ill, in the four-day-long trial, was the continuance of a pattern of the court trying to damage the plaintiff, including physically.

The court, in assessing the best interests of the plaintiff's child, who is disabled and medically complex, conspicuously neglected to incorporate the opinions of medical doctors and senior therapists, outsourcing such a duty to the Guardian ad Litem, who has no technical acumen herself, had been requested, in writing, to be the Guardian ad Litem for the case by

opposing counsel, with whom she had worked several times before, and who had interviewed only one doctor, a generalist, who was new and had not met the father.

The child's brushes with death, particularly post-NICU, had all been related to neurosurgery. Yet the Guardian ad Litem had not talked to a single neurosurgeon or neurosurgery-oriented nurse practitioner. Depositions administered by the plaintiff of medical doctors were given negligible weight, even though one doctor had confirmed that the plaintiff had recommended the procedure which had saved the child's life when critically ill in the ICU, another had verified that the plaintiff's intervention had prevented the mother from having a surgery done to the child which had been unneeded, and a third who concurred with the plaintiff that present administration of the child's anti-seizure medication required revisiting and optimization (particularly as the child's anti-seizure medication regimen had been assigned well before neurologists knew that the child's seizures were being driven by an overlooked, failed VP brain shunt, not general epilepsy, divulged by the plaintiff).

Furthermore, the court, in its final orders, dismissed the possibility that the mother had been suicidal - she had denied, perjuriously, when asked during cross-examination, that she had ever been - even though a transcript of an audio recording, admitted by the court, had multiple instances of the mother and plaintiff discussing her suicidal history. The court pretended that the plaintiff was making up her suicidal history - apparently, part of his non-kinetic, hands-off, ethereal sort of domestic abuse - though the mother, while being recorded, noted that she no longer had the problem of being suicidal. The mother's suicidal ideations haunted the plaintiff's family for years, and still do. If the mother did not get custody of their child, after so much

investment in false, perjurious statements against the father, she could commit suicide, if not murder/suicide.

In dismissing the mother's suicidal history, the court could also pretend that the plaintiff had not been a stay-at-home father and husband in Greater Seattle trying to keep his wife, with intrusive thoughts, and medically complex son alive, while waiting for the opportunity, if their health returned, to return home to Montana.  Similarly, the court pretended that the father had been of little use - mostly a nuisance, which conflicted heavily with the actual words of medical doctors and therapists, who respect the plaintiff - when accompanying his son to the hospital, though it did concede that the father had added a bit of value once upon a time when the child had been admitted to the hospital.  That isolated time had been when the father had recommended the procedure which had saved his critically ill son's life, as substantiated by deposition of an ICU doctor.  Apparently, that had been a particularly lucky day for the plaintiff, because the rest of the time he had added little to no value in a hospital setting, according to the court.  Even after reading the deposition of Dr. Kenneth Epley - the doctor, arguably, who had been around the plaintiff's son the most and since the NICU - who said of the plaintiff, "You are analytical at every step of the way, thinking through processes in an objective manner and probably less emotional than I think you should have been at times.  But definitely calm and cool and collected and approaching things in an analytical way."  And: "You were at every appointment that he came to that I can recall at least.  And parents that are that engaged tend to very aware of what's going on with their children."

The court described Dr. Epley's - as well as Dr. Benjamin's and Dr. Martin's - comments as of little use, while considering no other medical doctor input, as if the plaintiff's son was not highly medically complex, including frequent brushes with death.

On two separate occasions, the mother had asked the plaintiff to break the restraining order, which was based on her and her friends' perjurious statements. Both times, he refused. He had never once considered breaking the restraining order, even though it had been based on false allegations. He lives in Montana, 700 miles away from her. She, not he, has been the only one who has sought to be around the other. During the trial, the mother admitted, when cross-examined, that she had asked him, twice, to break the restraining order, but that she had "regretted it" each time. Judge Straley ruled to keep the restraining order against the plaintiff in effect.

The court, as well, pretended that the medical providers of Washington State had performed well, on behalf of the child, and that the plaintiff's criticism of them - even after presenting an executed retained agreement with a Seattle-based medical malpractice firm, and the deposition of an ICU doctor in which he confirmed that Seattle Children's Hospital's pediatric neurosurgeons had refused to participate in the brain pressure check via lumbar puncture that the plaintiff had recommended because they didn't believe that the child's VP brain shunt had failed or that his brain pressure had been elevated - was the plaintiff being characteristically difficult, rather than being a wonderful father and advocate for his son, which would have implied parental fitness, which would have complicated its preordained ruling against the plaintiff.

Seemingly, the court would have preferred for the father to act emasculated and docile and show deference to the most elite neurosurgeons in Washington State and, thus, allow his son to die. Instead, he convinced the ICU doctors that the neurosurgeons might be wrong and, with or without them, to check the child's brain pressure via lumbar puncture. Again, the child's brain pressure was measured at 600% higher than normal, per medical records and deposition, and, after the valve of the brain shunt had been replaced, the child went from critically ill to normal.

The court, however, was unimpressed. Judge Straley kept the plaintiff's parenting time at 0%. Arguably, the plaintiff is the only father who recently saved his son's life and who has never laid a hand in anger on anyone or threatened to do so who has negligible access to his son.

Seemingly, the court wants to protect fellow, effete Washingtonians - the pediatric neurosurgeons of Seattle Children's Hospital who had acted negligently, over several years - from a Montana father. And to try to discredit the plaintiff in advance should he have a medical malpractice lawsuit served against them. (Judge Straley was born and raised in Seattle.)

The court was aware that the plaintiff was circulating formal statistical studies (by National Parents Organization and CustodyXChange, a data analytics firm) to a variety of Montana State, Washington State, and federal entities, suggesting that Washington State has one of the most anti-father court systems in the nation, based on average parenting time allotted to fathers, among other factors, and had requested their intervention. The court was also aware that the plaintiff had told such entities that King County Superior Court welcomed false allegations against fathers and was an integral part of the Enterprise through which the defendants achieved their predicate acts. The court's actions against the plaintiff - including its temporary and final orders - constituted retribution, judicial misconduct, and abuse of discretion, if not assault.

The court's rulings also violated the plaintiff's due process and Second Amendment rights, treating someone like a criminal who has never committed or been charged with a crime; someone who has never threatened anyone with a gun or other weapon (when the mother was asked by the plaintiff, during cross-examination, if he had ever insinuated that he could harm someone in his family with his bolt-action hunting rifle, she said no, contradicting her psychotherapist's declaration from two years prior which noted that the mother had made such a claim; one of them had been dissembling); someone on whom no one has ever had to call 911 or report to CPS; someone who has never laid a hand in anger on anyone nor threatened to do so; someone who is a decorated, honorably discharged military veteran with service in a combat zone; someone who is a beloved, highly proficient public high school math teacher in low-income, underserved school districts, including on a Native American reservation in Montana; someone who gave up his career to take care of his besieged wife and child; someone widely regarded as having an excellent value system and deeply committed to his son.  Someone who is a most honorable parent.  That is not what the 14th Amendment intended in its protection of parents' fundamental liberty interest in the care, custody, and management of their children:  for an influential state like Washington State to curtail a parent's constitutional rights whimsically, as principally an exercise in its own unchecked power, against a father who has unearthed and circulated to other state and federal agencies its anti-father track record, confident that federal district courts, especially Western Washington Federal District Court, will invoke the domestic-relations exception, even when there is a most serious federal question to address.

Motions to Reconsider and for New Trial must be approved by the same judge whose actions nearly led to the plaintiff's death - a statistically improbable and hollow form of recourse

in this specific case. An Appeal, given the substantial lead times involved and the court's intention to seek an immediate sale of the plaintiff's assets, including separate assets, and to deprive him access to and medical and educational decision-making regarding his son, could not be executed in time to protect the plaintiff from wanton retribution. In addition, federal questions exist which cannot be handled by Washington State.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Claims for Relief (Causes of Action)**

**Count 1:** Perjury

**Defendants:** Claudia Carboni (formerly Claudia Carboni-Mues); Patricia English; Kirstyn Palmisano; Serin Ngai; Selena Shelley.

**Legal Theory for Claim:** Perjury must be a false statement under oath that is both intentional and material.

**Example 1 (Count 1):** Ms. Carboni, desiring a protection order from King County Superior Court, described in her declaration that, when the plaintiff had come up to the front porch of his long-time friend's house, his friend was so afraid that he wouldn't unlock the door. He hid behind the door and would speak to the plaintiff only through the small opening created by the chain that had the door locked. Naturally, this harrowing, frightening depiction got the court's attention and led to a protection order, which was repeatedly continued (and remains in effect to this day). However, upon deposing the friend in question, when asked if this scene was correct, the friend replied that it wasn't accurate. The friend stated that not only was he physically outside on the front porch with the plaintiff - rather than hiding behind the door - but that the door in question doesn't even have a "chain". Yet for two years this perjurious statement was

Page 21 of 46

allowed to remain in effect, harming the plaintiff's case, defaming him, and serving as the framework for the opposing party's "stalking" accusation. In addition, it should be noted that Ms. Carboni, by text, had told the plaintiff she was staying at a "hotel", not at his friend's house. During the divorce trial, two years after the perjurious statement had been first submitted, Ms. Palmisano conceded that the statement had been untrue. Yet the court contends that the Ms. Carboni, versus the plaintiff, is the one who has "credibility", an absurd conclusion that panders to the criminal perjurers of Ms. Palmisano, Ms. Carboni, et al.

**Example 2 (Count 1):** Ms. Carboni, desiring a protection order from King County Superior Court, described in her declaration that she had to borrow money from friends because otherwise the plaintiff could track her whereabouts through their "family payment methods". However, the plaintiff and Ms. Carboni have shared no family payment methods. That is, no joint checking, saving, credit cards, debt cards, Venmo, Paymal, crypto, etc. During the trial, under cross-examination, Ms. Carboni conceded that she and the plaintiff shared no "family payment methods". Given that English is not Ms. Carboni's first language, it is unlikely that she created this perjurious statement on her own. Likely, it was inserted into her declaration by Ms. Palmisano. For two years, this perjurious statement harmed the plaintiff's case, and helped formed the basis behind the protection order, which remains in effect. Yet the court contends that Ms. Carboni, versus the plaintiff, is the one who has credibility, an absurd conclusion that panders to criminal perjurers.

**Example 3 (Count 1):** Ms. Shelley, helping Ms. Carboni seek a protection order from King County Superior Court, described in her declaration that the plaintiff "insinuated" that he could harm either Ms. Carboni or their son with his bolt-action hunting rifle. Ms. Shelley, per

deposition, had never met the plaintiff. During the divorce trial, two years later, Ms. Carboni denied that the plaintiff had ever insinuated that he could harm either her or their son with his rifle. Either Ms. Carboni or Ms. Shelley committed perjury, and contributed to the issuance of a Surrender Weapons Order, which remains in effect, two years later.

**Example 4 (Count 1):** Ms. Shelley, helping Ms. Carboni seek a protection order from King County Superior Court, noted, in her declaration, that the plaintiff had "threatened" Ms. Carboni. When asked how the plaintiff had threatened her during a deposition, Ms. Shelley couldn't answer. She said she didn't want to "misspeak".

**Example 5 (Count 1):** Ms. Carboni, when asked, during the divorce trial, if she'd ever been suicidal, replied, "No." This was yet another example of perjury. In a transcript of an audio recording admitted as evidence, the following discussion of Ms. Carboni's suicidal ideations occurred: Mr. Mues: "Basically, I've been in this traumatized state where if I don't see you and Leo when I walk in the house, I go down to the basement where you said you were thinking of hanging yourself." Ms. Carboni: "Oh, well, that's your problem, dude. That's your problem. That's your fucking problem." (Ms. Carboni spoke to the plaintiff in this abusive way just feet away from their son in the hospital, who had recently had a major seizure. She had been upset that the plaintiff deemed the major seizure a "serious" issue, rather than the result of just "low sodium". Time has proven the plaintiff correct. At the time, the child had needed corrective VP brain shunt neurosurgery. Without it, the child experienced successive seizures just two weeks later, with his "sodium" perfectly in specification.) Also, this exchange regarding Ms. Carboni's suicidal tendencies were captured in the transcript: Mr. Mues: "Claudia, you were the one considering killing yourself when you were pregnant with Leo." Ms. Carboni: "Are you going

to pull that up because my therapist is gonna speak on my behalf." Mr. Mues: "Yeah, but…"
Ms. Carboni: "We're gonna see. Because I don't have any more that problem, John." Yet the
court pretends that Ms. Carboni was never suicidal - Judge Straley wrote as much - and that the
plaintiff was making that up. The court pretends Ms. Carboni's "81" sessions with a
psychotherapist - now, well over a hundred - weren't for treating her PTSD symptoms, of which
suicidal ideations were one.

**Example 6 (Count 1):** Ms. English, helping Ms. Carboni seek a protection order from King
County Superior Court, noted, in her declaration, that Ms. Carboni, on the day divorce papers
had been served, after she had left the home with their son, was concerned he would show up and
was looking out the window. When deposing Ms. English, she noted that both Ms. Carboni and
she had been able to track the plaintiff's coming and going from the home in Des Moines via
Ring camera. That is significant because, before the plaintiff returned home, he could not have
known that Ms. Carboni had left their home with their son (he did not have access to the Ring
camera). Ms. Carboni had left the home hours after he had left to find a divorce attorney and
complete two other errands (attend a doctor's appointment at VA Hospital Puget Sound and pick
up his repaired truck from Renton Dodge (he was driving a loaner vehicle)). And when he
returned home after picking up his repaired truck, he didn't leave the home until the next
morning. When deposed, Ms. English said that the plaintiff, after he had returned home, had left
for a "thirty minute" period, which had caused Ms. Carboni's panic. That was untrue, and can be
vetted in two ways. Ms. English had provided a detailed timeline in her declaration but had left
out the "thirty minute" interlude. She said that it had been "cut out" of her original declaration.
In addition, Ms. Carboni had supplied the court with dozens of random Ring camera videos. If

the plaintiff had indeed left the home for "thirty minutes", causing her to panic, she would have supplied the relevant Ring camera video showing the plaintiff's departure. She still could. But that didn't - and won't - happen, because the video doesn't exist. The plaintiff simply came home and didn't leave until the next morning. Ms. English and Ms. Carboni were working together to frighten the court into approving (and continuing) the protection order.

**Example 7 (Count 1):** Ms. English, during the divorce trial, said that, when the plaintiff came up to the front porch of his long-time friend's (and Ms. English's) house he asked if they were sheltering Ms. Carboni. Specifically, she said, "He said, "Are you housing Claudia?"" This was yet another example of perjury, introduced by Ms. Palmisano. The plaintiff denied having said that. Ms. English had not written this in her detailed declaration. When deposed and asked why she had accused the plaintiff of stalking, she hadn't mentioned it. In fact, Ms. English may not have been able to hear this statement, as the plaintiff hadn't been talking to her and she wasn't in sight. That is, Mr. Antonic, her husband, had been on the front porch with the plaintiff, with the door not fully open. The plaintiff had not been able to see Ms. English except at the beginning, when she was about thirty feet away, in the back of her house. Furthermore, when the plaintiff deposed Mr. Antonic - seven months after the false stalking allegation - and asked him why he had been accused of stalking, Mr. Antonic expressed genuine shock. He asked who had accused the plaintiff of stalking (his wife and Ms. Carboni). He said he didn't know and hadn't heard or read anything about that. When asked if he regarded the plaintiff as law-abiding, he said yes. When asked if he had ever known the plaintiff to commit a crime (stalking is a crime), he said no. When the plaintiff then deposed Ms. English, he asked if she knew that Mr. Antonic - her husband - had no idea, seven months after the fact, that she had accused the plaintiff of stalking.

She replied that Mr. Antonic's not knowing didn't surprise her. Stalking implies danger. If the plaintiff had been stalking, then Ms. English would have informed her husband that the plaintiff had been stalking around their house. But she didn't.

**Example 8 (Count 1):** Ms. Shelley, in her declaration, helping Ms. Carboni seek a protection order, emphasized that the plaintiff was a military veteran, as if that was problematic. She noted that he had, remotely, evacuated people from Afghanistan in 2021 during the U.S. withdrawal, and that he had exhibited "manic" behavior. Yet Ms. Shelley had never met the plaintiff. When deposed, Ms. Shelley noted that "manic" had been her own assessment of the plaintiff, not Ms. Carboni's. But the plaintiff hadn't been manic. He hadn't volunteered to evacuate anyone from Afghanistan as he was his family's caregiver. He had been asked by a former graduate school classmate to assist her friend's friends from Afghanistan, and had refused. Only a week later, when his classmate called him back and told him about the near deaths of her friend's friends, did he agree to assist. The plaintiff and a small team of remote and in-country personnel he put together - with the help of Ms. Carboni - then managed the evacuation of that group. Subsequently, the plaintiff and his team were able to evacuate a number of other Americans, green card holders, and SIV Afghans, whom had requested help, with no casualties.

**Example 9 (Count 1):** Ms. Shelley, in her declaration, helping Ms. Carboni seek a protection order, described the plaintiff as not knowing much about the medical needs of the child. Specifically, she wrote, "My sense is that John doesn't know Leo's medication or developmental support needs." When Dr. Benjamin, Dr. Epley, and Dr. Martin were read this quote during their depositions, each of them rejected it. Again, she had never met the plaintiff.

**Example 10 (Count 1):**  Ms. English, in her declaration, said that the plaintiff, when he had driven by their home, had been "lying in wait", even though he had walked down the main sidewalk, up the front steps, and up to the front door of her house, ringing the doorbell, within ten minutes after parking.  Ms. English agreed that it had been within ten minutes.  When deposed, Ms. English said she had no evidence that the plaintiff had been "lying in wait".  She had merely said that to move the court.

**Example 11 (Count 1):**  Ms. English noted, in her declaration, despite spending, as she confirmed, only about ten hours around the plaintiff over the last four years, and, of that ten hours, all of it was during scheduled dinners, usually with others around who think quite highly of the plaintiff and have referred to him as the "essential parent" (see declaration of Mike Breen), "I would place no confidence in John's ability to resolve or cope with a crisis in his role as a parent."  When Dr. Benjamin, Dr. Epley, and Dr. Martin were read this quote during their depositions - Dr. Benjamin and Dr. Martin were in the ICU with the child critically ill, the ultimate "crisis" scenario - each of them rejected it.

**Example 12 (Count 1):**  Ms. Ngai - requested, in writing, by Ms. Palmisano to be the Guardian ad Litem, with the court demurring to her wish - did not object to any of the false and perjurious items above.  It is difficult to imagine Ms. Palmisano formally recommending a Guardian ad Litem who would object to false allegations against fathers, once revealed, as Ms. Palmisano had packaged many of them.  Ms. Ngai, unsurprisingly, hadn't.  Ms. Ngai's first question to the plaintiff, unbelievably, during the Guardian ad Litem interview, was, "Do you think Obama and Schumer are out to get you?"  (The plaintiff's answer, after being taken aback, was "no".)  Ms. Ngai had interviewed Ms. Carboni before the plaintiff.  Ms. Carboni, having suffered from

intense suicidal ideations, had been professionally diagnosed with a psychiatric disorder, requiring nearly a hundred sessions with a psychotherapist. Ms. Ngai pretended as if the plaintiff, who had, in response to false allegations against him, volunteered for a mental health assessment on two occasions, with the results - 100% negative - submitted to the court and reviewed by Ms. Ngai, was the one with the disorder. Ms. Ngai may have had a bias against the military, veterans, and the VA as the plaintiff's mental health assessments, which she marginalized, were administered by the VA's mental health division. Though, had the VA assessments been positive, versus negative, for a psychiatric disorder, Ms. Ngai would have taken them seriously.

**Example 13 (Count 1):** Ms. Ngai, after the plaintiff had emailed her examples and timestamped photos of child neglect by the mother, and after transcripts of depositions showing false allegations had become available, and the plaintiff had requested new temporary orders, conspired with Ms. Palmisano - who had requested, in writing, her as Guardian ad Litem, with the court demurring to her wish - and the mother to accuse the plaintiff of child neglect. The mother had staged several photos, timestamped for when the plaintiff had dropped off his son with her. There was a photo with refried beans in the child's front bangs. The plaintiff had shown a receipt for California Burrito, where he had purchased the refried beans, the same day as the timestamped photo. The plaintiff, in fact, had given the mother the carton of refried beans that his son hadn't finished. She had then smeared the beans in the child's hair, and taken a photo of it. Other photos - of an old dirty diaper, etc. - were taken in the same way. Rather than wondering why an accusation of child neglect had so quickly followed the plaintiff's request for new orders and custody of their child - as well as his emails and timestamped photos to the

Guardian ad Litem showing child neglect by the mother - or why none of the staged photos by the mother showed the child in distress or with rashes or red marks, she fully endorsed the mother's and Ms. Palmisano's false allegations of child neglect and the truncation of the plaintiff's parenting time from 16% to 7%. Ms. Ngai disingenuously referred to the photos as "disturbing". Then, when the father, who had just been hired as a high school math teacher in Montana, could no longer commute each week from Montana to Washington to visit his son - he had tried, unsuccessfully, to get new temporary orders to support visitation in both Montana and Washington - the Guardian ad Litem accused him of "abandonment", another obvious lie. Moreover, the court, rather than accounting for the data, above, resorted to its "believe women" framework, overturned Commissioner Williamson's (ironically, a woman's) courageous refusal to further reduce the plaintiff's parenting time to 7%, with no overnights. Indeed, Ms. Palmisano, Ms. Ngai, and the court were collaborating to fully disenfranchise the plaintiff from his son's life, and to penalize him for having identified and communicated the existence of rampant false allegations and perjury against him.

**Example 14 (Count 1):** Judge Schubert, during a recorded UCCJEA Determination hearing in November, 2024, replied to the plaintiff, when he noted that the opposing party had made false allegations against him, that that wasn't true. While Judge Schubert hadn't lied per se, he had had little to no basis on which to make that statement. Judge Schubert said this prior to Discovery, suggesting a lack of due process. In other words, it wouldn't matter what the plaintiff was able to produce through Discovery. Judge Schubert (and King County Superior Court) had made up their minds.

**Count 2:** 14th Amendment Due Process Violations

**Defendants:** Honorable Kenneth Schubert; Judge Straley; Commissioner Frances Turean; Commissioner Paul Eagle; Commissioner Camille Schaefer; Commissioner Hillman; M Craig Bray; Dennis Worsham; Dr. Umair Shah.

**Legal Theory for Claim:** The 14th Amendment's due process clause protects parents' fundamental right to care for, educate, and manage their children's lives, only to be curtailed if the state identifies a compelling state interest and deems that such curtailment is in the best interests of the child. In the Washington State case of Carboni-Mues vs. Mues, the integrity of the process was deeply compromised and damaged by rampant perjury, assault, and deprivation of rights under color of law. Therefore, curtailment of the plaintiff's parenting rights under the 14th Amendment has no reasonable basis and represents a flagrant violation of the U.S. Constitution. For example:

1) the court not only tolerates perjury - false allegations which are both intentional and material, like those above - and other non-perjurious false allegations against fathers, but welcomes them. With every ruling based on perjury and other false allegations against fathers, the criminal cottage industry in Washington State that traffics in false allegations against fathers grows stronger;

2) the court, through its rulings, tried to humiliate and emotionally and physically damage - to the point of death, which nearly happened - the plaintiff because of his previous (respectful) communications to the court and other state and federal agencies that King County Superior Court apparently embraces perjury against fathers, requesting external intervention;

3) Office of Disciplinary Counsel - of the Washington State Bar Association, and empowered by the Washington State Supreme Court to regulate the conduct of the state's licensed

attorneys - at least in a family law context, turns a blind eye to perjurious activity from Washington State's licensed attorneys, harming fathers' due process;

4) Washington State Department of Health, which licenses and regulates mental health professionals, turns a blind eye to mental health professionals who inject themselves into the judicial process and who - without meeting or trying to meet (even virtually) the individual in question - evaluate that individual or provide language that can be misconstrued as an evaluation of that individual or otherwise disparage that individual in such a way that it materially skews the court's decisions, benefiting - almost always - her paying client. In Carboni-Mues vs. Mues, Ms. Shelley, a Washington State-licensed psychotherapist, had earned approximately $30,000 from Carboni-Mues's insurance over nearly 100 sessions (Carboni-Mues had been suicidal and diagnosed with severe PTSD due to observing a fatal accident), and had never met (or tried to meet, even virtually) the plaintiff (Mues), yet had described the plaintiff, in her declaration to the court, as "homicidal", "suicidal", capable of "kidnapping", having "insinuated" that he could harm his family with a rifle, "manic". Note: the plaintiff has no criminal history, has never been charged with a crime, no one has ever called 911 or CPS on him, he has never laid a hand in anger on anyone, he has never threatened to lay a hand in anger on anyone, and is a respected public high school teacher and decorated, honorably discharged military veteran. No one had ever accused him of being anything other than professional and high-integrity before. Clearly, Ms. Shelley was trying to help her client gain custody of their son. Eighteen months prior to Ms. Shelley's perjurious declaration and false allegations against the father, as captured in an audio recording, transcribed and admitted as evidence by the

court, Ms. Carboni tells the plaintiff - as she is bullying the plaintiff for (correctly) believing that their son's major seizure was "serious" and not simply a function of "low sodium", and suggesting divorce - that her counselor (Ms. Shelley) would speak up for her. Indeed, she did "speak up for her", eighteen months later, in the most shameful, dishonest, and court-manipulating way. But Washington State Department of Health sees no issues, either.

5) Ms. Ngai, the Guardian ad Litem, had been hand-picked, in writing, by opposing counsel. The court also selected Ms. Ngai, over the plaintiff's objections. Given the perjurious statements made against the father, packaged by opposing counsel, it is unreasonable to believe that opposing counsel would have hand-picked, in writing, a Guardian ad Litem who would object to such statements. Indeed, Ms. Ngai did not, though she reviewed compelling proof of perjury. In addition, Ms. Ngai and Ms. Palmisano have worked together on prior cases, presumably profitably. They act as a combined unit.

6) The child in question is highly medically complex: prematurely born; contracted E.coli Meningitis; VP brain shunt installed; false negative regarding VP brain shunt functionality over three years; history of seizures (driven by overlooked, failed VP brain shunt); global developmental delays (driven by overlooked, failed VP brain shunt). No doctor who has known the child for any length of time was consulted during the divorce trial. The plaintiff provided the court with three depositions of doctors. Judge Straley saw little value in those; perhaps they and the plaintiff were speaking a technical language in which Judge Straley has no expertise. Had Judge Straley gotten the help he needed to understand that language, he would have learned: Dr. Benjamin confirmed that the plaintiff had proposed

and advocated for the procedure which saved his critically ill son's life in the ICU. He also suggested negligence on the part of the child's neurosurgeons, whose diagnoses the plaintiff correctly rejected, which had led to the ICU doctors checking the child's brain pressure via lumbar puncture, without the neurosurgeons' participation. Dr. Epley confirmed that the plaintiff's intervention had prevented the mother from having a surgery done to the child that he did not need. Dr. Martin confirmed that the child's present anti-seizure medication regimen - irrationally upheld by Washington State neurologists afraid of changing course - may be seriously sub-optimal for the child. These are the depositions Judge Straley dismissed as having little utility in the case. The notion of thoroughly disenfranchising a father from his son whose life he literally saved when no one else could - including Washington State's elite neurosurgeons, who had concluded that the child's brain pressure was normal when it was, in fact, 600% higher than normal and rising, reaching fatal levels - is, in fact, the repudiation of fatherhood itself. Washington State would rather have been told the plaintiff's son had died than know that a Montana father successfully stood up for his son against negligent Washingtonian medical providers.

7) King County Superior Court financially obligated the plaintiff over two years, prior to the final trial, to levels that exceeded both his current gross annual income and the average of his gross annual income over the past five years. (The average of his gross annual income over the past five years is mentioned because, unfortunately, some fathers truncate and shut down certain income streams to game the system and potentially lower their financial obligations to their spouse and child; that was certainly not true in the plaintiff's case.) The plaintiff gave up his career to take care of his suicidal wife and medically complex and

Page 33 of 46

disabled son. The financial obligations King County Superior Court exacted on the plaintiff - which he satisfied in full before he ran out of money - he requested modification of orders prior to running out of money but Commissioner Frances Turean canceled the hearing for new orders the day of due to excessive pages listed in Working Papers Submission List, a questionable, discretionary local rule that should not have been invoked given the seriousness of the matters at hand. (Case law shows that discretionary local rules should not be invoked to avoid larger questions of law and constitution. Moreover, the plaintiff had included two-page summaries of the high-page-count depositions and had also included the full depositions in case the commissioner wanted to see the summaries in a fuller context.) By saddling the plaintiff with such onerous financial obligations - particularly when the mother had been earning more than the plaintiff since 2020 - the court drove the plaintiff into homelessness - he slept in his truck most nights over the last two years - and undermined his ability to commute from Montana, his home, to Washington State to see his child. He commuted from Montana to Washington State without fail from issuance of temporary orders (August, 2024) to June, 2025 - often navigating icy roads and blizzards to see his son for only the shortest while, per the visitation schedule - at which point the court additionally truncated his parenting time from 16% to 7%, based on a specious, retaliatory motion by the mother (Commissioner Williamson had refused to further truncate the plaintiff's parenting time, but Judge Schubert overruled her). This also coincided with the end of the plaintiff's ability to afford the Montana-to-Washington State commute. Finally, the excessive financial obligations also compromised the plaintiff's ability to afford an attorney, forcing him to represent himself pro se.

*8)*   Judge Straley, while the plaintiff, representing himself pro se, was severely ill, forced the plaintiff, over his objections, to participate in a four-day trial. After the first day, the plaintiff was diagnosed with influenza and shared the medical records with Judge Straley. He forced the plaintiff to rejoin the trial with influenza. After day three, with the plaintiff's health degraded, the plaintiff went to the Emergency Room where he was diagnosed with pneumonia. Therefore the plaintiff had had both pneumonia and influenza during the trial. Later that evening, an episode occurred, due to the court's forcing the plaintiff to participate in the trial while seriously ill, that nearly cost the plaintiff his life. Washington State law requires judges to approach trials "de novo". Judge Straley's decision to force the plaintiff to participate in the trial while severely ill suggests that Judge Straley violated that de novo law, had the ruling in mind before the trial had started - which fully excised the plaintiff from his son's life, and ordered the sale of the plaintiff's separate assets - and wished to humiliate and injure the plaintiff. (The plaintiff, again, as King County Superior Court knows, has circulated statistics showing the anti-father track record of Washington State courts, of which King County Superior Court is the largest.) In turn, the plaintiff's due process was materially affected.

**Count 3:** RICO

**Defendants:** Honorable Kenneth Schubert, Honorable Paul Eagle, Honorable Frances Turean, Honorable Camille Schaefer, and Honorable Judge Straley (of King County Superior Court); Kirstyn Palmisano (of Elliott Palmisano Law Group); Serin Ngai (of Sound Family Solutions PLLC); Selena Shelley; Patricia English; M Craig Bray and Doug Ende (of Office of Disciplinary Counsel); Dr. Umair Shah and Dennis Worsham (of Washington State Department

of Health); Mayra Toledo and Sarah Mitchell (of Highline School District); Claudia Carboni;

Patricia English; and Joe Doe et al.

**Legal Theory for Claim:** The claim of Racketeering Influenced and Corrupt Organizations

(RICO) is due to the existence of an Enterprise in Washington State - an association in fact -

through which the above defendants commit predicate acts affecting Washingtonians and non-

Washingtonians alike (the plaintiff is a Montanan) and which have, among others, cross-border

commercial effects. A pattern exists in which false allegations against fathers, including perjury,

are used for tactical advantage in divorce and child custody proceedings. Each defendant serves

a unique role. Those - certain judges and commissioners - affiliated with King County Superior

Court welcome, judicially notice, and assign outsized weight to information that is provably false

and perjurious. They also exact retribution, from emotional to physical damage, against those

who identify and communicate the existence of false allegations against fathers, including

perjury. Those affiliated with certain family law firms in Washington State encourage and

package false allegations on behalf of their clients for the court's consumption. Those affiliated

with certain Guardian ad Litem firms exist to ascribe a veneer of legitimacy to clearly false and

perjurious information against fathers. They form an unofficial business relationship with the

lawyers who package false allegations. Such lawyers specifically request them by name. The

availability of such lawyers' hand-picked Guardians ad Litems is assured, decreasing the

probability that a neutral, honest Guardian ad Litem would be selected by the court. They

operate as a combined unit with the lawyers who call for them by name. Furthermore, those in

the Washington State Department of Health protect from complaint and criticism licensed mental

health counselors who have unofficially partnered with the combined units of attorneys and

Guardians ad Litem to further ascribe a veneer of legitimacy to clearly false and perjurious allegations against fathers. Similarly, the Office of Disciplinary Counsel, at least in the context family law, protects from complaint and criticism licensed attorneys who have encouraged and packaged ostensibly false and perjurious allegations against fathers. The defendants above reassure female petitioners or respondents amid a divorce and child custody struggle and their friends, otherwise honorable, that they may lie about their husband or male partner in Washington State with total impunity, thus transforming them into an accessory to the criminality at hand. Like an engineering system, the interconnected Enterprise provides the platform, capacity, and authority through which the defendants perform predicate, profit-maximizing acts on behalf of themselves and their paying clients.

**Count 4:** Deprivation of Rights Under the Color of Law (18 U.S.C. § 242); Assault (RCW 9A.36.011); Judicial Misconduct (Article IV, Section 31 of the Washington State Constitution)

**Defendants:** Honorable Nicholas Straley, Honorable Paul Eagle, Honorable Kenneth Schubert, Honorable Frances Turean, Honorable Camille Schaefer

**Legal Theory for Claim:** Judge Straley knew the plaintiff, who was representing himself pro se, was severely ill during the divorce trial. He, in fact, asked the plaintiff, who, on the first day of trial, was coughing profusely, to put on a mask. After the first day, the plaintiff went to the VA Hospital Puget Sound where they diagnosed him with influenza. The plaintiff emailed Judge Straley and opposing counsel the medical records. Judge Straley forced the plaintiff, over his repeated objections, to participate in the four-day-long trial. The plaintiff's voice was so weak that he had to expend great energy - even yell at times - just to be audible. He would periodically have to lay down and fall sleep in the middle of the trial - while representing himself pro se.

Judge Straley and his staff observed all of this. At the end of the third day, the plaintiff, whose health had continued to deteriorate, went to the Emergency Room at the VA Hospital in Helena (between the second and third days of trial, the plaintiff had flown back to Montana). They diagnosed him with pneumonia. Extremely weak from having been forced to participate in the trial while severely ill, the plaintiff, on the way back home, in Deer Lodge, along Highway 12, lost consciousness and collided with an oncoming vehicle. 52 years old, the plaintiff had never been in an accident before. The oncoming vehicle flipped and the plaintiff's vehicle slammed into the base of a sheer cliff. All airbags were activated. An accident report was created by the Montana State Highway Patrol. No citations were issued. Miraculously, all parties survived, walking away from the accident with only minor injuries. Had the plaintiff died, no one would have known about how Judge Straley assaulted the plaintiff. Certainly, opposing counsel, her client, Judge Straley, and Judge Straley's staff would not have mentioned it, as they understood the cruelty and injustice as it was unfolding and recognized that it was meant to humiliate and damage the plaintiff, and to pander to the opposing counsel and her client, who have routinely committed perjury against the plaintiff. But the assault had been two years in the making, as well. Commissioner Eagle issued temporary orders in the divorce - and Judge Schubert denied the plaintiff's motion to reconsider - that obligated the plaintiff financially not only beyond his gross annual income but beyond the average of his gross annual income over the past five years. Commissioner Eagle, without evidence, wrote in his temporary orders that the plaintiff was hiding money, parroting the perjurious opposing counsel. (The plaintiff's average income over time is mentioned because the plaintiff is a conscientious, credible person - a lauded public high school teacher and decorated, honorably discharged military veteran and, before the separation, a

full-time stay-at-home caregiver to his medically complex son and suicidal wife, who had been professionally diagnosed with severe PTSD due to her observance of a fatal SCUBA diving accident - who, in no way, would have artificially reduced his income to game the system and lower his expected financial obligations in a divorce.) The onerous, cruel financial obligations - based on an amount of income he has never earned - quickly depleted the plaintiff's savings. The plaintiff was able to fully comply with the ruling for seven months straight until his funds ran out - depleting much of his life's savings. He had, as well, previously, submitted a motion for new orders, including modification of financial obligations, which was denied by Commissioner Frances Turean (due to her invoking a discretionary, local rule about page numbers, ensuring the plaintiff remain homeless). Immediately after, opposing counsel filed a motion for contempt of court, as the plaintiff had run out of money and could no longer pay. Though financial records showed that - from issuance of temporary orders to the contempt hearing, seven straight months - the plaintiff had consistently paid - in fact, overpaid, as he had paid for, while separated, four mortgage payments of the home in which his wife and son lived - the ordered amount, Commissioner Camille Schaefer still ruled that the plaintiff was in contempt. She noted that his arguments were "unpersuasive". The net effect was the plaintiff had to continue to sleep in his truck most nights, including over two full winters. This court-coerced homelessness contributed to several illnesses including the pneumonia the plaintiff had before, during, and after the trial. The plaintiff still suffers from having been forced to participate in the four-day trial, while severely ill, despite representing himself pro se, and over his objections. Despite due process conspicuously degraded, the plaintiff tried his best to

participate in the four-day-long trial per Judge Straley's orders, following all instructions. It nearly cost him his life.

**Count 5:** 2nd Amendment Violation

**Defendants:** Honorable Nicholas Straley, Honorable Paul Eagle, Honorable Kenneth Schubert, Honorable Frances Turean

**Legal Theory for Claim:** The initial imposition of a Surrender Weapons Order is not the issue and may have been justified given salacious, false information about the plaintiff that had not yet been proven to be false and perjurious. For example, Ms. Shelley, the mother's psychotherapist, who had never met the plaintiff, had described in her declaration to the court that the plaintiff had "insinuated" that he could use his rifle (a bolt-action Mossberg hunting rifle purchased in 2020 in Helena, Montana for hunting season) against his family. That, among other statements, was a complete fabrication, as six depositions and testimony during the divorce trial would verify. For example, when the plaintiff asked his wife, during cross-examination, if he'd ever "insinuated" using his rifle against his family, she said no. Yet Ms. Carboni had allowed that highly material false statement to exist, marinate, and damage her husband for almost two years. During the trial, the plaintiff presented a text exchange, on 10 February, 2024, between him and Ms. Carboni in which the plaintiff expressed concern that Ms. Carboni had said she wished that he were dead. She replied that he'd heard her wrong, that he needed to clean out his ears. The plaintiff, conversely, had never wished such a thing, or any other kind of violence, against Ms. Carboni. Yet the Surrender Weapons Order, two years after its issuance, remains in effect. Without intervention by a federal court, the order in contravention of the 2nd Amendment will remain intact, yet another smug Washingtonian snub of federal standards.

**Count 6:** Violations of Individuals with Disabilities Education Act (IDEA)

**Defendants:** Mayra Toledo; Sarah Mitchell; Highline School District, Washington State; Claudia Carboni

**Legal Theory for Claim:** IDEA protects parents' rights to be involved in the Individual Education Plan (IEP). While court orders - however based on false allegations against the father, including perjury - give the mother full educational (and medical) decision making authority over the son, they do not specify that the father cannot be a part of the development of the child's IEP. The plaintiff (father) is a lauded, beloved public school teacher. The plaintiff saved his son's life when critically ill when none of his doctors in Washington State could. He has been extremely helpful during prior IEP development sessions. But, due to the request of Claudia Carboni to exclude the plaintiff (even virtually) from participating in the child's IEP sessions, Mayra Toledo (principal of Des Moines Elementary School) and Sarah Mitchell (principal of Valley View Learning Center) in Washington State have obliged. Therefore, for at least three IEP development sessions, the plaintiff was intentionally and purposefully excluded, contrary to the spirit and letter of IDEA.

**Count 7:** Violations of Computer Fraud and Abuse Act (CFAA)

**Defendants:** Claudia Carboni

**Legal Theory for Claim:** In violation of CFAA, Ms. Carboni broke/hacked into the plaintiff's phone and computer on several occasions, as evidence by screen shots Ms. Carboni provided to the court of the plaintiff's bank account balances. She had also deleted a voice memo on the plaintiff's I-phone, as corroborated by, in 2022, the plaintiff sending a backup file of the voice memo, which she hadn't found and deleted on his I-phone, to a separate email account of his.

**Count 8:** Violations of Sanctuary Jurisdiction (8 U.S.C. § 1373)

**Defendants:** Honorable Nichola Straley, Honorable Kenneth Schubert, Claudia Carboni, Washington State (King County Superior Court)

**Legal Theory for Claim:** In 2025, the U.S. Department of Justice publicly commented, *"[Washington State is accused of] federal obstruction, conspiracy, and harboring statutes that carry criminal penalties with prison time."* This was specifically about Washington State's disregard of federal law in the context of its status as a sanctuary jurisdiction. Washington State, to circumvent this law and its obligations under it, and in line with its well-publicized interest in decriminalization writ large, has blatantly chosen to ignore the criminality of immigrants, undocumented and documented alike, so no record of their criminality exists that could be accessed by the federal government. In Ms. Carboni's case, she has clearly and repeatedly perjured herself - each instance, a crime - and encouraged others to do so, too - and, materially, against a decorated, honorably discharged military veteran and respected public school teacher with zero criminal history or history of complaints - and believes, presumably through the reassurances of Ms. Palmisano, her attorney, that she can do so, in Washington State, with total impunity. Those presumptions, to date, have been correct, thus requiring a federal corrective. Ms. Carboni, though documented and a legal permanent resident (green card holder), is nonetheless obligated to uphold at least a normal standard of conduct, per federal guidance. Criminal perjury, whether recognized by Washington State or not, falls well short of the normal standard of conduct expected of Ms. Carboni. Furthermore, the court's willful ignorance of Ms. Carboni's (and her friends') criminal perjury does not insulate it from holding criminals to account and complying in full with federal law.

Page 42 of 46

**Count 9:** 1st Amendment Violations

**Defendants:** Honorable Kenneth Schubert and Honorable Nicholas Straley

**Legal Theory for Claim:** The 1st Amendment protects, among other rights, free speech. Judge Schubert and Judge Straley penalized the plaintiff for communicating and highlighting, to other state and federal agencies, the false, even perjurious allegations being made against him that King County Superior Court, Office of Disciplinary Counsel, and Washington State Department of Health encouraged. Recognizing and reporting criminality, backed by evidence - perjury is a crime - is not the exclusive domain of the court, particularly when the court is tolerant of such criminality. Schubert and Straley also penalized the plaintiff for writing and publishing a book that additionally emphasized those false allegations and the court's refusal to question the credibility of those making them, alongside the court's eagerness to depict the plaintiff (and his witnesses) - multiple congressionally-nominated service academy graduates and decorated, honorably discharged naval officers - as having no credibility. They labeled the plaintiff's outreach to other state and federal agencies for help as "abusive use of conflict", without recognizing the irony of a homeless, health-stricken, financially-depleted respondent representing himself pro se, who has been habitually lied about, who has earned far less than his wife since 2020, being accused of "abusive use of conflict". (It should also be noted that, at all times, the plaintiff used respectful and professional language, absent any epithets, to express his points of view.) As if using one's mind, voice, and pen, when they are the last resources one has, isn't allowed. Judge Schubert and Judge Straley have both characterized the plaintiff as lacking "credibility", and Ms. Carboni as having it. As a Montanan, what makes one credible in Washington State can be hard to understand. At the U.S. Naval Academy in Annapolis, MD, to

Page 43 of 46

which the plaintiff was congressionally nominated and from which he graduated, credibility is no longer assumed after one has dissembled, especially repeatedly, like the opposing party. In Washington State, credibility appears to be a function of gender (the opposing party consists of all women), sexual orientation (Ms. Palmisano is a lesbian), race (Ms. English is black), ethnicity (Ms. Ngai is Chinese-American), citizenship (Ms. Carboni is a foreign national), mental health (Ms. Carboni has a psychiatric disorder), and residency (the opposing party consists of all Washingtonians), rather than honor and integrity.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Demand for Judgment (Prayer for Relief)**

A potential Motion for Reconsideration and Motion for New Trial, given that Judge Straley's order from the divorce trial ignores all false allegations against the plaintiff, denies the plaintiff credibility and assigns credibility to the mother, denies the plaintiff's witnesses (including another decorated U.S. Naval Academy graduate and military veteran, and upstanding citizen) credibility and assigns credibility to the mother's witnesses (including those who have committed perjury), dismisses, contrary to medical doctor feedback, that the plaintiff has been instrumental to his son's life and survival, fully removes the plaintiff from his son's life, and forces an immediate sale of a clearly separate property owned by the plaintiff that has kept the plaintiff alive over the last two years, would have to be approved by Judge Straley himself, who assaulted the plaintiff and is a defendant and participant in the criminal racket and perjury factory described by the plaintiff in this federal complaint.

**The plaintiff requests the following relief:**

1. Stay all orders from 2026 divorce trial in King County Superior Court, Washington State, except monthly child support payments, which, due to the plaintiff's employment as a high school math teacher, he is able to satisfy.

2. Given the criminal element and the plaintiff's lack of due process in King County Superior Court in Washington State as described in this federal complaint, and the father's long-held residency in Montana, order jurisdiction of divorce and child custody to be transferred to Montana.  Note that, without the mother's suicide attempt by hanging while six months pregnant in a garage of a recently-purchased second home in Des Moines, Washington, and without the medical negligence and false negative of pediatric neurosurgeons over several years regarding the plaintiff's son's VP brain shunt failure, the plaintiff's son would be in Montana, not Washington State.  For example, the child's (and mother's) neonatal and prenatal team was originally located in Missoula, Montana at The Birth Center, per medical records.

3. Order defendants, in proportionality to their culpability, to financially compensate the plaintiff for his economic losses related to their actions, totaling $1,100,000.

4. Order defendants, in proportionality to their culpability, to financially compensate the plaintiff for his emotional and physical pain and suffering, totaling $10,000,000.

5. Order Ms. Carboni, contrary to Judge Straley's orders from divorce trial, which allow Ms. Carboni to travel freely internationally with child, to not take the child outside of the U.S., given the mother's second home in Sardinia, Italy, her professionally diagnosed psychiatric disorder, her child's misdiagnosed seizures when in Sardinia, and potential of an

international kidnapping incident if legal proceedings, for the first time, pivot from the mother's wishes and expectations. This is a real concern.

(It is plausible that Washington State family law judges and commissioners, since the tragic and murderous Travis Decker incident in Washington State, may be trying to penalize military veterans for Travis Decker's heinous actions, as Travis Decker was a military veteran, too. Though the actions of Commissioner Eagle, Commissioner Turean, Commissioner Schaefer and some of the actions of Judge Schubert preceded the Decker murders, Judge Schubert's overturning Commissioner Williamson's refusal to further truncate the plaintiff's parenting time from 16% to 7% - as the plaintiff was religiously commuting back and forth between his home in Montana and his son's location in Washington State - did happen right after the Decker incident, and Judge Schubert and Judge Straley both knew that the plaintiff was a military veteran and about the Decker murders.)

Plaintiff: _____ Date: 08 May, 2026 _____